SEARS, ROEBUCK AND CO., a corporation, Plaintiff,

v.

AMERICAN PRESIDENT LINES, LTD., a corporation, et al., Defendants.

AMERICAN PRESIDENT LINES, LTD., a corporation, Cross-Claimant,

v.

NATIONAL STEEL AND SHIPBUILD-ING COMPANY, a corporation, et al., Cross-Defendants.

NATIONAL STEEL AND SHIPBUILD-ING COMPANY, a corporation, Cross--Claimant and Third-Party Plaintiff,

v.

MacGREGOR–COMARAIN, INC., Cross-Defendant.

Nos. 47292, 47385 and 47637.

United States District Court,
N. D. California.

June 24, 1971.

Supplemental Memorandum
July 8, 1971.

Robert E. Patmont, Patmont & Meyers, San Francisco, Cal., for Sears, Roebuck & Co.

Robert H. Thede, Esq., Derby, Cook, Quinby & Tweedt, San Francisco, Cal., for Acme Mill Supply, and Phoenix Assur. Co., and others.

Norman B. Richards, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for American President Lines, Ltd.

Fielding H. Lane, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for Natl. Steel & Shipbuilding Co.

Barry L. Bunshoft, Cushing, Cullinan, Hancock & Rothert, San Francisco, Cal., for MacGregor-Comarain, Inc.

Frank J. Maley, Mendes & Mount, New York City, for Phoenix Assur. Co.

## MEMORANDUM FOR JUDGMENT

OLIVER J. CARTER, Chief Judge.

The case at bar is before the Court under admiralty and general maritime jurisdiction. The plaintiffs are the owners or subrogated insurers of numerous articles of cargo that were shipped aboard the SS President Monroe in late July and early August of 1966. The cargo was loaded onto the ship at various ports in Japan, and its ultimate destination was Los Angeles. While the vessel was in San Francisco unloading cargo other than the plaintiffs' that was aboard the ship, the master of the President Monroe ordered the number 6 forward deep tanks filled with seawater for ballasting purposes. All parties concede that it was during this ballasting operation that sea water entered the vessel's number 6 lower hold and damaged the cargo in question.

At the time the cargo was damaged, the President Monroe was owned, operated, and under the exclusive control of American President Lines, Ltd. (hereinafter APL). APL held this vessel out as a common carrier of goods for hire, and, as a common carrier, APL undertook all of the requisite obligations implicit in safely transporting the plaintiffs' goods on its vessel. The plaintiffs have sued APL for their losses and allege that APL was negligent and the President Monroe was unseaworthy. APL denies negligence, unseaworthiness, or any wrongdoing on its part.

The President Monroe was built by defendant National Steel and Shipbuilding Company (hereinafter NASSCO) from specifications supplied by APL. NASSCO subcontracted the work that dealt with the design and construction of hatch covers, tank covers and related apparatus to defendant MacGregor-Comarain Inc. (hereinafter MacGregor).

It is the plaintiffs' contention that their cargo was damaged when seawater entered the lower number 6 hold because of defective and malfunctioning coamings, lids and closing mechanisms of the number 6 deep tank hatches, and because a hole existed in the aforesaid coamings. They also allege that the employees of APL were not given adequate or proper instructions as to the operation of the tank lids, hatch covers, and their hydraulic closing devices. Plaintiffs further allege a breach of an implied warranty of fitness of purpose on the part of NASSCO and MacGregor.

Defendant APL asserts that its personnel used all due care required of them in the operation of closing and securing the deep tank steel hatch covers.

They deny any negligence and contend that the hatch covers supplied by MacGregor were inadequate and defective and, further, that MacGregor did not provide adequate instructions as to the operation of these hatch covers. APL further alleges that the overflow from the number 6 deep tanks into the lower hold resulted from a *hole* situated in the coaming of the deep tank. APL believes that the hole was negligently placed there while the vessel was under construction by NASSCO. Defendant APL has cross-complained against NASSCO and MacGregor for indemnity and contribution against any sums that APL is required to pay plaintiffs for damage to their shipments.

Defendant NASSCO denies any negligence or malfeasance and contends that the hole in the number 6 tank is of unspecified origin and was not placed there by it. NASSCO further alleges that the contract between NASSCO and APL limits its liability and should bar any recovery by APL against NASSCO. Defendant NASSCO denies that any warranty of fitness for purpose exists as to the President Monroe. NASSCO has filed a cross-complaint against MacGregor contending that if any defects existed in the number 6 hold they were there solely because of the negligent acts and omissions of MacGregor, and that MacGregor should indemnify NASSCO for any liability incurred by it. MacGregor contends that it is free from all fault and liability and that it should be dismissed from this action. During the course of the trial they made such a motion and the Court took said motion under submission.

## THE SS PRESIDENT MONROE WAS UNSEAWORTHY IN THAT THERE WAS A HOLE IN THE NUMBER 6 FORWARD PORT DEEP TANK

The duty of a shipowner to supply a seaworthy ship is absolute and cannot be delegated. Mitchell v. Trawler-Racer, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941; Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; Italia Soc. per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U. S. 315, 84 S.Ct. 748, 11 L.Ed. 732. APL cannot contract away the burden of unseaworthiness and the owner of the vessel must bear the full responsibility of any act or omission that makes his ship unseaworthy. Liability for unseaworthiness is absolute and imposed regardless of fault. Burton v. Greig, 265 F. 418 (5 Cir.); Dimas v. Lehigh Val. R. Co., 234 F.2d 151 (2d Circuit); Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. The fact that APL did not have actual or constructive knowledge of the hole nor the fact that it should not have known of its existence will not reduce its responsibility or liability. The shipowner has a non-delegable duty to furnish a seaworthy vessel, and no amount of due care will absolve him of that legal responsibility. Pinion v. Mississippi Shipping Co., 156 F.Supp. 652 (E.D.La.1957); Mormino v. Leon Hess, 210 F.2d 831 (2d Circuit).

## APL WAS NEGLIGENT IN THE OPERATION OF BALLASTING THE NUMBER 6 DEEP TANKS

The number 6 deep tanks were ordered filled with seawater by the Master of the President Monroe after the vessel had discharged a portion of its cargo in San Francisco. APL had not had occasion to perform this operation at any previous time as it had taken delivery of the vessel only six months before the date of the flooding. However, APL was present when the operation was carried out during the shakedown cruise prior to delivery. The task of ballasting is not a complex one, and it is a basic operation aboard a seagoing cargo vessel. The evidence presented at trial has shown that the crew of the President Monroe conducted the ballasting operation in a negligent and careless manner. The flooding of the dry cargo space was a result of leakage that occurred during the ballasting of the number 6 deep tanks. The water either leaked in through a hole in the

coaming of the number 6 deep tank or it may have entered because the hatch covers in the hold were improperly closed. But in either case if the water had been shut off immediately once the tanks were filled, extensive damage would not have occurred. The Court is not suggesting that APL bear the entire burden for the resulting damage to plaintiffs' cargo, but it does find that APL's negligence in this respect was a contributing cause of the damage.

Both the appliances, which measure the depth of liquid in the tanks, and the electrical bilge alarm system were inoperative during the ballasting operation.

APL knew that these devices were on the ship's deficiency list and thus could not be depended upon to warn the crew when the tanks were full. If the bilge alarms had been working then the overflow could easily have been discovered. The testimony of APL employees Beam and Woslewski indicates that no extra precautions were taken *even though* there was ample notice that these systems were inoperable. Clearly some sort of precautions could have been taken to assure that the ballasting would be done properly and without mishap. Sounding lines could have been lowered into the tanks, and someone could easily have visually observed at least a portion of the filling procedure; once the water reached the appropriate level, the operation could have been halted. APL had a duty to assure the safe carriage of plaintiffs' cargo.

The testimony further indicates that the sounding tubes that would have alerted the crew to the fact that the tanks were full, had the tubes been working properly, were blocked with wooden plugs. This condition was not discovered until *after* the flooding had occurred. The reliance of the crew of the President Monroe on these vents as an indicator that the tanks were full was reasonable and proper. The blockage of the tubes could be determined only *after* they were once tested. There was no reason for APL to think that the sounding tubes might be stopped up.

The tank test foreman of NASSCO, Mr. Duarte, testified that the vents were sealed with wooden plugs for the testing of the vessel prior to delivery to APL, and that the plugs were later removed. It seems evident that this was not the case. The plugs were overlooked and not removed by NASSCO and there is no reason that APL should have had knowledge of this omission. The negligence of both parties caused the flooding. APL depended on the sounding tubes to provide a warning that the tanks were full. This was circumvented by the negligence of NASSCO in its failure to remove the plugs after testing.

NASSCO contends vehemently that the hole in the coaming of the tank was of little consequence in the actual flooding of the cargo area. It alleges that the flooding was a consequence of the hatch covers failing to close properly. Regardless of how the entire amount of water got into the cargo area, APL may have been negligent in its failure to properly close and secure the hatch covers in the number 6 hold. It is entirely possible that the hatch covers were not adequately closed and secured and there was a leakage as a result of this. All the amount of water that entered the dry cargo area obviously could not have come from the small hole in the tank coaming. The Court will not speculate as to how much water came from which source . . . it is probable that both the hole and the improperly closed hatch cover caused the flooding.

## THE HOLE IN THE STEEL COAMING OF THE NUMBER 6 FORWARD PORT DEEP TANK WAS PLACED THERE BY DEFENDANT NASSCO

The Court is convinced from the evidence that NASSCO is responsible for the hole that leaked seawater into the dry cargo area and thus caused damage to the plaintiffs' goods. The testimony of witnesses and the physical evidence leave little room for any other conclusion. Mr. Beam testified that no

painting aboard ship was done after delivery of the vessel and up to the time that the hole was discovered. The paint around the hole was not scorched or burned as it would have been had the cutting of the hole occurred *after* the ship was originally painted. NASSCO painted the vessel *after* the hole was made as it was the *only* party that painted the President Monroe. Captain McGee also testified that there was no evidence of repainting around that hole. John Walsh, a consulting engineer and surveyor, stated that the hole could not have been made *after* the joining together of the welded steel plates and thus only NASSCO could possibly have made the hole. Mr. Munroe also said that only NASSCO could have cut a hole such as the one that existed. He further stated that no repair work whatever was done in the number 6 hold area when the vessel had minor repairs done while it was in Hong Kong and Yokohama. Finally, Professor DeGarmo testified that the hole had to have been cut before the welding of the deck plate to the beam and girder; NASSCO alone could have performed such a feat.

The testimony of NASSCO witnesses and employees is not particularly illuminating as to the possibility that the hole was cut by someone other than NASSCO. Neither Mr. Richie nor Mr. Duarte could give any alternative as to how the hole came into existence. Mr. Richie states that the welding was inconsistent with the type that would normally have been done on this type of job. But even he could not say unequivocally that the hole was not done by NASSCO. Duarte remembered that the hole was not evident at the time the vessel was originally tested, but he admitted that other holes were plugged on the ship for testing purposes. Neither remembers any details of the testing.

There was no one, other than NASSCO, that had either the opportunity or the capability to make a hole such as the one that existed in the number 6 deep tank. The Court, therefore, finds that the hole was made and negligently left unsealed by NASSCO and it must bear the burden and responsibility for any damage caused by seawater entering through the hole into the area where the plaintiffs' cargo was stowed.

## THE REWRITING BY APL OF THE INSTRUCTIONS AS TO THE OPERATION OF THE HATCH COVERS IN THE NUMBER 6 HOLD RELIEVES DEFENDANT MacGREGOR FROM LIABILITY

The Court is in agreement with APL's argument that a manufacturer or supplier of goods has a duty to warn users of his product of any defects that may exist in the product and of operational procedures essential to proper use of the product. APL argues that MacGregor's operational instructions were insufficient to properly advise users as to the correct operation of the hatch covers in the number 6 hold deep tank. This may have been true as regards the original instructions.

However, once APL realized that the hatch covers were somewhat unusual in their method of closing, and that the original instructions appeared inadequate to insure proper functioning, an APL expert drafted instructions designed to eliminate the operational problems. The expert alleged that his new instructions would be understandable to anyone involved in such an operation. Captain Dwyer, the APL expert, stated that he inspected the ship prior to delivery to APL, and that, in his opinion, the instructions as to the operation of the hatch covers were inadequate. He states that after complaining to both NASSCO and MacGregor he finally drafted new instructions because of the imminency of delivery of the ship to APL. Captain Dwyer contends that he showed the revised instructions to Mr. Todd of MacGregor, and Dwyer alleges that Mr. Todd stated that the new instructions were entirely adequate without revision.

Todd has testified that he did not in fact approve the revised instructions, but rather told Dwyer that if they

worked, as Dwyer stated they did, then obviously they were fit for their intended purpose. This would not seem in itself to relieve MacGregor from liability if Mr. Todd observed an apparent lack of understanding on the part of APL. However, Dwyer, an APL expert in this area, stated to Todd that these instructions were capable of conveying their intended meaning. Captain Dwyer stated that *"anyone"* could run the hydraulics for the hatch covers if they followed his revised instructions and this seems to obviate the argument that MacGregor's warning should have been more precise. The sole purpose of having any directions at all was to enable crew members, stevedores and the like to effectively operate the hatch covers. If Captain Dwyer and APL, with full realization that a problem existed, were satisfied that their revised instructions were effective and capable of conveying their meaning, then there was no reason for Mr. Todd to disapprove them.

Once APL was cognizant that new instructions were needed and on this basis proceeded to draft them, there was neither need nor necessity for MacGregor to alter the new guidelines of which APL approved. APL, with understanding of the operation and possible flaw, felt that its own guidelines were adequate, and there was nothing to indicate to MacGregor that they were otherwise.

APL should have either demanded that MacGregor draft new and clearer instructions or refused to accept the vessel until MacGregor complied with the demand. APL did not do this, and the actions of APL in revising and accepting its own guidelines and directions of operation of the hatch covers without *demanding* that MacGregor either approve or disapprove, formally, of them, is a cause that intervenes to relieve MacGregor from alleged liability for failure to properly warn of a defect in their product. Therefore, the Court concludes that the rewriting of the instructions for the opening and closing of the hatch covers in the number 6 hold deep tank relieved defendant, MacGregor, from liability.

## AN ACTION BASED ON BREACH OF AN IMPLIED WARRANTY OF FITNESS WILL LIE IN ADMIRALTY

NASSCO has urged this Court to find that it has no jurisdiction in admiralty over any claim against NASSCO arising out of the shipbuilding contract for the President Monroe between APL and NASSCO. It is a well established rule that contracts for the building of ships are not maritime. Peoples Ferry Co. of Boston v. Beers, 61 U.S. (20 How.) 393, 15 L.Ed. 961 (1851); Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961). However, there is a conflict of opinion between district courts as to whether or not implied warranties of fitness and merchantability are recognized in admiralty. This Court can find no reason or logic that prohibits it from recognizing implied fitness warranties in admiralty. If either Sears or APL can make out an action based on an implied warranty then the fact that admiralty law is involved should not be a bar to recovery on that theory. This Court respectfully disagrees with the finding of the District Court of Delaware in Noel v. United Aircraft Corp., 204 F. Supp. 929 (Del.1962) when it held that warranties of fitness and merchantability are not recognized in admiralty. This Court will, in the alternative, look to the sound reasoning of the decisions in Middleton v. United Aircraft Corp., 204 F.Supp. 856 (SDNY, 1960) and Montgomery v. Goodyear Tire and Rubber Co., 231 F.Supp. 447 (SDNY, 1964). The court quite clearly stated that "an action based on breach of implied warranty will lie in admiralty." Montgomery v. Goodyear Tire and Rubber Co., *supra* at 455.

NASSCO wishes to use their shipbuilding contract with APL to limit its liability to APL because of the limitation clauses in the contract. But NASSCO

also wants this Court to find that it has no jurisdiction over an implied warranty of fitness because of the nature of the contract. The Court will not allow this defendant to escape liability in this way. Neither the plaintiffs nor APL should have to pursue a myriad of remedies nor should they have to file a multitude of suits in different courts in order to obtain relief based on an implied warranty of fitness. See Sevits v. McKiernan-Terry Corp., 264 F.Supp. 810 (SDNY, 1968).

It is the conclusion of the Court, therefore, that a warranty of fitness under the shipbuilding contract between APL and NASSCO will lie in admiralty.

## PRODUCTS LIABILITY CLAIM WILL LIE IN ADMIRALTY AND NASSCO IS LIABLE TO PLAINTIFFS FOR A MARITIME TORT FOR ITS NEGLIGENT FAILURE TO DISCOVER AND SEAL THE HOLE MADE DURING THE CONSTRUCTION OF THE PRESIDENT MONROE

 The Court believes that a products liability claim will lie in admiralty. Sanderlin v. Old Dominion Stevedoring Corp., 385 F.2d 79 (4th Cir. 1967); Sieracki v. Seas Shipping Co., *supra.* See also McCune "Maritime Products Liability", 18 Hastings L.J. 831 (1967). The indication in admiralty is that it draws upon and incorporates the law prevailing on land when there is no statutory or historic principle to the contrary. Igneri v. Cie. de Transports Oceaniques, 323 F.2d 257 (2d Cir.) cert. den. 376 U.S. 949, 84 S.Ct. 965, 11 L. Ed.2d 969 (1963). See also, McKee v. Brunswick Corp., 354 F.2d 577 (7th Cir. 1965). There is no reason for admiralty not to move with the great majority of land cases that hold that a third party may recover from a manufacturer on a products liability theory. The Supreme Court recognized in Simpson Timber Co. v. Parks, 369 F.2d 324 (9th Cir. 1966) cert. granted, vacated and remanded, 388 U.S. 459, 87 S.Ct. 2115, 18 L.Ed.2d 1319 (1967); 390 F.2d 353 (9th Cir. 1968),

that products liability will lie within admiralty jurisdiction. See also, Sevits v. McKiernan-Terry Corp., *supra*, Middleton v. United Aircraft Corp., 204 F. Supp. 856 (SDNY 1960), and Schaeffer v. Michigan-Ohio Navigation Co., 416 F.2d 217 (6th Cir. 1969).

 The Court further finds that even though the defendants' (NASSCO) tortious conduct occurred on land, admiralty has jurisdiction on *all* maritime torts. It was stated without equivocation in Dunn v. Wheeler Shipbuilding Corp., 86 F.Supp. 659 (EDNY 1949), "that which the libels portray is clearly a maritime tort, i.e., the alleged error in design, although originating on land, became manifest, if at all, upon the high seas." Granted, the present case was not one of defective design, but nevertheless the act on land was the cause in fact of the damage on the seas. Admiralty jurisdiction is proper even though the negligent act occurs on land. The damage was inflicted at a point within admiralty jurisdiction. See, Patel Cotton Co. v. The Steel Traveler, 111 F. Supp. 821 (SDNY 1953); Todd Shipyards Corp. v. United States, 69 F.Supp. 609 (D.Me.1947); The S. S. Samovar, 72 F.Supp. 574 (N.D.Cal.1947). There is an unavoidable and solidifying relationship between the wrongful acts and omissions committed on land and the injury or damage that is inflicted on navigable waters. They cannot be separated, and liability cannot be avoided merely because a defect was not discovered while the ship sat on land before delivery. The damage was done on navigable waters and is a maritime tort.

Therefore, the Court concludes that a products liability action will lie in admiralty.

## PRIVITY IS NOT NECESSARY IN ORDER FOR A CAUSE OF ACTION TO LIE BETWEEN PLAINTIFFS AND DEFENDANT NASSCO

 The distinctive feature of many cases involving products liability actions is the effort to widen the range of plain-

tiffs who may be entitled to relief from any given defendant and, at the same time, to increase the number of defendants who may be liable to a specific plaintiff. To accomplish these aims established concepts of liability must often be expanded, limiting concepts removed, and new theories developed. However, it is noted that as the common law developed a limitation of liability existed as to who might sue whom. This limitation was called privity. It was, for a great many years, a well established rule at both common law and maritime law that privity of contract had to exist for the maintenance of a tort action that involved negligence when the liability of the defendant appeared to depend upon the breach of a contractual obligation to the plaintiff.

Almost as soon as the privity rule was laid down, however, the courts began to repair and draw away from it. See Thomas v. Winchester, 6 N.Y. 397 (1852); Gerrity v. The Bark Kate Cann, 2 F. 241 (EDNY 1880); Coughlin v. The Rheola, 19 F. 926 (SDNY 1884). But it was McPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, which expressed the rationale for the total abolition of the privity requirement and this philosophy is well known and has been exhaustively commented upon. James, "Products Liability", 34 Tex.L. Rev. 192 (1955); Prosser, "Assault on the Citadel", 69 Yale L.J. 1099 (1960). Adoption of the *McPherson* rule into maritime law occurred in Sieracki v. Seas Shipping Co., *supra*, a case that is known chiefly for its holding extending the seaworthiness doctrine to longshoremen. The Court there observed that "the principles in MacPherson . . . are broadly applicable, that law having become so widely accepted as to be construed as a part of the general law of torts, maritime as well as common law." 149 F.2d 98, at 99–100 (3rd Cir.). See also Dunn v. Wheeler Shipbuilding Corp., 86 F.Supp. 659 (EDNY 1949) (dictum); *The S. S. Samovar, supra*.

Since *Sieracki* a long line of cases make clear that the determination of negligence liability of a tort-feasor, or of joint tort-feasors, to one injured in person *or in property* in the maritime law is now based upon the long established principles of duty of care, foreseeability and proximate cause, and is unaffected by the presence or absence of privity in a contractual relationship.

## THERE CAN BE NO CONTRIBUTION BETWEEN MUTUAL WRONG-DOERS IN ADMIRALTY

 Both APL and NASSCO have prayed for contribution from each and from MacGregor should one or both be found liable to plaintiffs. The Court points out to both parties that contribution between joint tort-feasors in non-collision maritime cases has consistently been denied in this Circuit. Union Sulphur & Oil Corp. v. W. J. Jones & Son, 195 F.2d 93, 94–95 (9th Cir. 1952); States S. S. Co. v. Rothschild-International Stevedoring Co., 205 F.2d 253 (9th Cir. 1953); Amerocean Steamship Co. v. Copp, 245 F.2d 291 (9th Cir. 1957); Mickle v. The H. W. Schulte, 188 F.Supp. 77, 81–82 (N.D.Cal.1960).

Clearly both NASSCO's and APL's claim is further refuted by the decisions of the United States Supreme Court in Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952); Pope and Talbot Inc. v. Hawn, 346 U.S. 406, 74 S. Ct. 202, 98 L.Ed. 143 (1953); Federal Marine Terminals Inc. v. Burnside Shipping Co., Ltd., 394 U.S. 404, 89 S.Ct 1144, 22 L.Ed.2d 371 (1969).

Based upon a long line of cases it is extremely clear that it is a well recognized rule in maritime law that, with the exception of collision cases, there can be no contribution in maritime cases.

## THERE WILL BE NO INDEMNITY TO NASSCO FROM MacGREGOR

 MacGregor in no way violated its contract with NASSCO and any act

or omission on its part, if such existed, was superseded by the acts and omissions of APL. MacGregor is not liable to either plaintiffs or APL, and NASSCO has not proven either contractual or tort liability against this defendant. MacGregor is relieved from liability as to all parties.

## NASSCO AND APL ARE JOINTLY AND SEVERALLY LIABLE TO PLAINTIFFS FOR ALL CARGO THAT WAS DAMAGED AS A RESULT OF THEIR INDIVIDUAL AND COMBINED NEGLIGENCE

 The Court cannot possibly apportion damages among the two negligent defendants as it is impossible to determine how much water came from what source or who is responsible for what damage. The precise extent that the joint tort-feasors contributed to the plaintiffs' damages is undetermined. The plaintiffs are entitled to compensation for their damages regardless of how the loss is apportioned among the wrongdoers. Therefore, the defendants that have not been relieved from liability in this case, NASSCO and APL, must bear the burden for the losses suffered by the plaintiffs. It is the ruling of this Court that APL and NASSCO are jointly and severally liable to the plaintiffs in this action.

Therefore, this case having been tried and the evidence having been heard, and counsel having presented their oral arguments, and the matter having been submitted,

It is the judgment of this Court that the evidence has established that the vessel The SS President Monroe was unseaworthy, and that the defendant APL further was guilty of negligence. It has further been shown that defendant NASSCO is guilty of negligence. The Court further concludes that defendant MacGregor is not guilty of any negligence as to the plaintiffs or co-defendants. Accordingly, MacGregor will be dismissed with prejudice from this action.

Therefore, defendants APL and NASSCO are jointly and severally liable to all plaintiffs for a yet undetermined amount of damages. Said damages will be determined at a later date as ordered by the Court. This memorandum will constitute the findings of fact and conclusions of law for this case. Counsel for plaintiffs are instructed to prepare and present a judgment in accordance herewith.

## SUPPLEMENTAL MEMORANDUM

It has been brought to the Court's attention that an improper standard of care was imposed upon American President Lines when the Court held, in its memorandum for judgment dated June 24, 1971, that APL's vessel, the S.S. President Monroe, was unseaworthy. This Court, in that memorandum, held that a strict, absolute duty was owed to provide a seaworthy vessel to the plaintiffs in this action. The Court erred in imposing liability regardless of fault upon the defendant APL.

 The Carriage of Goods by Sea Act, Title 46 U.S.C.A. § 1300 et seq., applies to APL in the case at bar. Under this Act liability can be imposed upon a common carrier only if the damage to cargo was caused by a lack of *due diligence* on the part of the shipowner to make the ship seaworthy. There is, therefore, no absolute duty to provide a seaworthy ship. However, the burden of proving that due diligence was exercised to make the ship seaworthy falls upon the owner of the vessel, Carriage of Goods by Sea Act, §§ 3(1) (a), 4(1), 46 U.S.C.A. §§ 1303(1) (a), 1304(1). See also J. C. Penney Co. v. American Express Co., 201 F.2d 846 (2d Cir., 1953); Schroeder Bros. Inc. v. The Saturnia, 226 F.2d 147 (2d Cir. 1955).

 This Court finds that APL failed to establish or prove that it used reasonable care or due diligence in assuring the seaworthiness of the President Monroe. The statutory obligation of the carrier to use due diligence to make its vessel seaworthy is either met

or not met when the vessel "breaks ground." Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq. The hole in the coaming of the number six hold deep tank could easily have been discovered by APL had it ballasted that tank in testing the ship after it took delivery of the vessel from the ship builders. APL has failed to show the Court that such testing would have been either difficult or even burdensome for it to have performed. The shipowner had a duty to assure the plaintiffs in this action that their cargo would remain dry and intact once plaintiffs turned said cargo over to defendant APL. If a shipowner fails in his duty to use due diligence to make the ship seaworthy, the shipowner, and not the cargo owner, assumes the risk of damage to the cargo. See Ore Steamship Corporation v. D/S A/S Hassel, 137 F.2d 326 (2 Cir. 1943). APL has not convinced this Court that it used any efforts *at all* to see to it that the dry cargo space aboard the President Monroe was watertight and secure.

Therefore, it is this Court's conclusion that the evidence shows that the President Monroe was unseaworthy under the definitions provided by statute in the Carriage of Goods by Sea Act.